# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

SUSANNA MELANSON, LINDA
BLACKWELL, CARL CLARK,
KEITH COLWELL, TERESA
ISOM, AND MUHAMMED
JACKSON on behalf of themselves
and all others similarly situated,

          Plaintiffs,

v.

MERCEDES-BENZ USA, LLC and
MBG AG,

          Defendants.

Case No. 1:22-cv-02628-ELR

**THIRD AMENDED CLASS ACTION COMPLAINT**

(1)  Breach of Express Warranty
(2)  Breach of Implied Warranty
(3)  Violation of California Consumer Legal Remedies Act
(4)  Breach of Express Warranty – Song-Beverly Warranty Act
(5)  Breach of Implied Warranty – Song-Beverly Consumer Warranty Act
(6)  Violation of Connecticut Unfair Trade Practices Act
(7)  Fraud by Concealment
(8)  Violation of Minnesota Prevention of Consumer Fraud Act
(9)  Violation of Minnesota Uniform Deceptive Trade Practices Act
(10) Violation of Texas Deceptive Trade Practices Consumer Protection Act

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

I.     INTRODUCTION.............................................................................1

II.    PARTIES........................................................................................6

III.   JURISDICTION...............................................................................19

IV.    VENUE ..........................................................................................22

V.     APPLICABLE LAW .........................................................................22

VI.    FACTUAL ALLEGATIONS ..............................................................22

       A. The Electrical System Defect. ...................................................22

       B. Mercedes Knew of the Electrical System Defect Prior to Sale or
          Lease of the Class Vehicles. ....................................................24

       C. Pre-Release Design And Testing ...............................................25

       D. Mercedes Knew of the Electrical System Defect From Its Own
          Service Center Data. ................................................................25

       E. Mercedes Knew of the Electrical System Defect Based on Its
          Receipt of Large Numbers of Orders for Replacement Batteries..........26

       F. Mercedes Knew of the Electrical System Defect from Its Own
          "Local Informations" (Technical Service Bulletins). ...........................27

       G. Mercedes Own Failed Countermeasure to the Electrical System
          Defect: "Deep Discharge Protection.".....................................29

       H. Mercedes Knew of the Electrical System Defect from Class
          Member Complaints Made Directly to Mercedes and/or Collected
          by NHTSA's Office of Defect Investigations. ......................................32

       I. Mercedes Knew of the Electrical System Defect Based on Class
          Member Complaints on Public Online Forums. ....................................35

       J. Mercedes Knew of the Electrical System Defect Based on Lemon
          Law Decisions...........................................................................38

VII.   APPLICABLE WARRANTIES .........................................................41

VIII.  MERCEDES MARKETING AND CONCEALMENT ...........................43

IX.    FRAUDULENT CONCEALMENT ALLEGATIONS.............................47

X.     TOLLING OF THE STATUTE OF LIMITATIONS................................50

A. Fraudulent Concealment Tolling .......................................................... 50

B. Estoppel .......................................................................................... 50

C. Discovery Rule ................................................................................. 51

XI. CLASS ACTION ALLEGATIONS ......................................................... 52

A. Numerosity ...................................................................................... 53

B. Typicality ........................................................................................ 53

C. Adequate Representation ................................................................. 54

D. Predominance of Common Issues .................................................... 54

E. Superiority ....................................................................................... 56

XII. CAUSES OF ACTION ........................................................................... 57

FIRST CAUSE OF ACTION ................................................................ 57

SECOND CAUSE OF ACTION ........................................................... 62

THIRD CAUSE OF ACTION ............................................................... 63

FOURTH CAUSE OF ACTION ........................................................... 68

FIFTH CAUSE OF ACTION ................................................................ 73

SIXTH CAUSE OF ACTION ............................................................... 75

SEVENTH CAUSE OF ACTION ......................................................... 77

EIGHTH CAUSE OF ACTION ............................................................ 81

NINTH CAUSE OF ACTION ............................................................... 84

TENTH CAUSE OF ACTION .............................................................. 87

XIII. RELIEF REQUESTED ......................................................................... 90

XIV. DEMAND FOR JURY TRIAL ............................................................. 92

## I.    INTRODUCTION

1.    Plaintiffs Susanna Melanson, Linda Blackwell Carl Clark, Keith Colwell, Teresa Isom, and Muhammed Jackson bring this action individually for themselves and on behalf of all persons who purchased or leased certain vehicles equipped with materially uniform and uniformly defective electrical systems designed, manufactured, distributed, warranted, marketed, and sold or leased by Mercedes-Benz USA, LLC ("MBUSA") and Mercedes-Benz Group AG f/k/a MBG ("MB Group") (collectively, "Mercedes"), as described below.

2.    The vehicles at issue in this action include Mercedes Class S, C, A, CLA, CLK, CLS, G, GLA, GLK, GLC, ML, GLE, GL, GLS, and E vehicles for model years 2009 to present (the "Class Vehicles").[1]

3.    This action is brought to remedy violations of law in connection with Mercedes's design, manufacture, marketing, advertising, selling, warranting, and servicing of the Class Vehicles. A serious design defect causes the electrical system to fail in its most important function: to retain sufficient battery charge to start the vehicles under normal operating conditions.

---

[1] Plaintiffs note that they expect this class definition may change at class certification, depending on what information is revealed in discovery.

4.      The Electrical System Defect ("Defect") at issue in this case is as
follows: The Class Vehicles are all equipped with a variety of electrical bus
communication systems, including Controller Area Network bus ("CAN bus"),
Local Interconnect Network ("LIN"), Media Oriented Systems Transport
("MOST"), and FlexRay. Energy management is achieved via communications on
the CAN bus between computer modules that, under normal operating conditions,
communicate and/or control various sensors and signal acquisition modules
throughout the Vehicle. Signals sent and received via the CAN bus system from
switches, sensors, and controllers facilitate drawing and distributing battery power
and activating and deactivating components (including, for example, battery
decoupling devices[2]). These functions are intended to regulate current draw and
ensure that the Vehicle retains sufficient battery charge to start under normal
operating conditions. The Defect causes accessories and sensors that should
receive a CAN bus signal instructing them to power off when the Vehicle is turned
off to instead remain active, drawing current from the battery at an unreasonably
high rate. This drains the battery unnecessarily, resulting in depleted batteries that

_____

[2] Mercedes's battery decoupling devices are sometimes referred to as the "Battery
Disconnect Switch" or "F32k2 Quiescent Current Cutoff Relay," which, on
information and belief, are functionally identical parts.

- 2 -

must be replaced prior to the end of their ordinary, useful life and/or renders Vehicles unexpectedly inoperable.

5.      In addition to causing drivers to incur sudden expenses (*e.g.*, roadside assistance, mobile jump packs, maintainer/trickle chargers, diagnostics, and battery replacements), the Electrical System Defect can leave drivers stranded in potentially unsafe circumstances.

6.      On information and belief, the Electrical System Defect is substantially the same, from an electrical engineering standpoint, in all Class Vehicles, in that the Electrical System in each Class Vehicle is made up of substantially the same components, employs the same general mechanisms, and is subject to the same faults that allow inappropriate current draws when the Vehicles are turned off.

7.      Mercedes does not have a permanent, effective remedy for the Defect. Its only "solutions" to the Electrical System Defect are a failed countermeasure and temporary "band aids" that force Class Members to pay for unexpected out-of-pocket expenses, such as diagnostics, replacement batteries, towing services, mobile battery jump packs, trickle chargers, software updates, and rental cars—all without actually fixing the problem.

8.      On information and belief, prior to Plaintiffs' purchase or lease of the Class Vehicles, Mercedes knew of the Electrical System Defect through, or as evidenced by, sources such as pre-release design and testing information; lemon law arbitration decisions; technical service bulletins (which Mercedes terms "Local Informations"); development and implementation of an ultimately unsuccessful countermeasure specifically addressing the Defect; service center data; replacement part sales data; early consumer complaints made directly to Mercedes, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; testing done, including testing in response to consumer complaints; aggregate data from Mercedes dealers; and other internal sources not yet available to Plaintiffs without discovery.

9.      In fact, some Mercedes service centers have told Class Members the Electrical System Defect is a "known issue," while also deceptively telling other Class Members nothing is wrong with their Class Vehicles. Yet Mercedes has knowingly failed to disclose and actively concealed the Electrical System Defect from Class Members and the public *prior* to purchase/lease. Mercedes continues to market and advertise its battery, a component of its electrical system, as promising "advanced performance" and "efficiency," and being "fine-tuned to complement"

the "exact network of engine sensors, electrical harnesses, and signal receivers" in the Class Vehicles. This is false.

10.    Mercedes knew or should have known that the "solutions" it charged Class Members to "remedy" the Electrical System Defect were not permanent fixes for the Defect.

11.    The Electrical System Defect negatively affects the driveability and usefulness of the Class Vehicles. The Electrical System Defect is substantially certain to manifest in the Class Vehicles, and many Class Members have had their batteries (and replacement batteries) die multiple times.

12.    Mercedes has failed to provide a permanent in-warranty fix for the Defect and failed to reimburse Class Members for the costs of its inadequate and temporary "solutions."

13.    In sum, as a result of Mercedes's misconduct, Plaintiffs and Class Members were harmed and suffered actual damages, in that the Class Vehicles have manifested, and continue to manifest, the Electrical System Defect, and Mercedes has not provided a permanent remedy for this Defect. Furthermore, Plaintiffs and Class Members overpaid at purchase for the Class Vehicles with undisclosed Defects, and incurred, and will continue to incur, out-of-pocket unreimbursed costs and expenses relating to the Electrical System Defect.

## II.    PARTIES

*Plaintiff Susanna Melanson (Connecticut)*

14.    Plaintiff Susanna Melanson resides in Bristol, Connecticut.

15.    Ms. Melanson owns a 2017 Mercedes CLA230, which she purchased new from New Country Mercedes Benz in 2017.

16.    Ms. Melanson's vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the Vehicle Identification No. WDDSJ4GBXHN500790.

17.    Ms. Melanson purchased the vehicle for her personal, family, and household use.

18.    Ms. Melanson expected her vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the Electrical System Defect would unexpectedly drain her battery and render her car inoperable, nor was she aware from any source prior to purchase of the repeated, ineffective, and costly "repairs" Mercedes suggests are necessary to operate her vehicle.

19.    Plaintiff Susanna Melanson never received any of her vehicle warranty materials until after delivery of her vehicle. Specifically, Plaintiff Susanna Melanson was only first apprised of the terms of the vehicle warranty in a cellophane-plastic-sealed warranty booklet that accompanied her vehicle after

accepting delivery of the vehicle. Plaintiff Susanna Melanson was unaware of the specific terms of the vehicle warranty other than generalized information that all new Mercedes-Benz vehicles are covered by a 4-year/50,000-mile warranty.

20.    Soon after purchasing her 2017 Mercedes, Ms. Melanson brought her car to the Mercedes dealership in Hartford to address battery drain issues. The dealership failed to solve the problem.

21.    Ms. Melanson has had to replace the battery in her vehicle at least four times since the initial vehicle purchase. Her vehicle has become inoperable because of the Electrical System Defect and has had to be towed to a repair shop at least four times.

22.    Between uses of her vehicle, Ms. Melanson has to keep the vehicle wired to a trickle charger (battery maintainer), which is plugged in after the car is shut off and unplugged when the car is driven in order to prevent the battery from becoming depleted.

23.    To date, Ms. Melanson has spent approximately $1,300 for multiple batteries, tows, diagnostics, battery charger, and labor due to the Electrical System Defect.

24.    Ms. Melanson viewed Mercedes's advertising materials touting the reliability of its vehicles and relied on these advertisements in making her purchase

decision. Nowhere in these advertisements did Mercedes disclose the Defect. Had

Mercedes disclosed the Defect, Ms. Melanson would not have purchased her

vehicle or would have paid significantly less for it.

25. Ms. Melanson's vehicle has also suffered diminution in value due to

the Defect and the resulting loss in her vehicle's resale value.

*Plaintiff Linda Blackwell (California)*

26. Plaintiff Linda Blackwell is a resident of Sacramento, California.

27. Ms. Blackwell is the owner of a 2017 Mercedes GLA-250, which she

purchased as a certified used vehicle from Mercedes-Benz of Sacramento in

Sacramento, California in June of 2020.

28. Ms. Blackwell's vehicle was manufactured, sold, distributed,

advertised, marketed, and warranted by Mercedes, and bears the Vehicle

Identification No. WDCTG4GB3HJ342856.

29. Ms. Blackwell purchased the vehicle for her personal, family, and

household use.

30. Ms. Blackwell expected her vehicle to be of good and merchantable

quality and not defective. She had no reason to know, or expect, that the Electrical

System Defect would unexpectedly drain her battery and render her car inoperable,

nor was she aware from any source prior to purchase of the repeated, ineffective, and costly "repairs" Mercedes suggests are necessary to operate her vehicle.

31.    Ms. Blackwell first experienced an unexpected battery drain soon after purchasing her vehicle in 2021. In about 2021, the vehicle failed to start when she was parked at her gym. She called her dealership, which sent a mobile repair truck with a replacement battery. In July of 2022, her car would not start at her home. She called her dealership, which sent a roadside assistance crew to jump start her vehicle.

32.    Ms. Blackwell has spent approximately $525 in payments for repairs that she incurred as a result of the Defect.

33.    Ms. Blackwell viewed Mercedes's advertising materials touting the reliability of its vehicles and relied on these advertisements in making her purchase decision. Nowhere in these advertisements did Mercedes disclose the Defect. Had Mercedes disclosed the Defect, Ms. Blackwell would not have purchased her vehicle or would have paid significantly less for it.

34.    Ms. Blackwell's vehicle has also suffered diminution in value due to the Defect and the resulting loss in her vehicle's resale value.

*Plaintiff Carl Clark (Ohio)*

35.    Plaintiff Carl Clark is a resident of Shaker Heights, Ohio.

36.    Mr. Clark is the owner of a 2012 Mercedes GL-450, which he purchased used from Northeast Auto Gallery in Bedford, Ohio in September 2019.

37.    Mr. Clark's vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the Vehicle Identification No. 4JGBF7BE0CA796834.

38.    Mr. Clark purchased the vehicle for his personal, family, and household use, and to use for individual catering gigs he is sometimes hired to perform.

39.    Mr. Clark expected his vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the Electrical System Defect would unexpectedly drain his battery and render his car inoperable, nor was he aware from any source prior to purchase of the repeated, ineffective, and costly "repairs" Mercedes suggests are necessary to operate his vehicle.

40.    Mr. Clark first experienced the battery drain caused by the Electrical System Defect a few months after purchasing his vehicle. He experienced the car failing to start in his driveway numerous times, and would have to jump the car in his driveway to start it. In March 2021, Mr. Clark brought the vehicle to a mechanic for routine maintenance, and the mechanic noted that the battery was draining, and suggested replacing the battery, which Mr. Clark initially deferred

due to cost. In August, 2021, Mr. Clark replaced the battery with one that he purchased.

41.    In December of 2023, Mr. Clark's battery died when he stopped at a gas station while grocery shopping with his mother. He called his insurance carrier, which sent a tow truck to jump the car. The driver attempted to jump the vehicle several times, but when the vehicle would not start, he towed it to Mr. Clark's home. Later, Mr. Clark replaced the battery and the starter. Since then, his car battery has died more than once. On August 24, 2021, for example, his vehicle stalled completely and the battery died so he had to replace the battery.

42.    Due to the Electrical System Defect, Mr. Clark is afraid to drive the vehicle because he feels the battery will drain again. He often needs to jump start his Mercedes GL-450 to get it to start in his driveway. Because of these fears, Mr. Clark usually only drives his Mercedes GL-450 no more than 50 miles per week because of the consistent battery draining problem.

43.    Mr. Clark has spent approximately $842.29 in payments for mechanics, battery replacements, and rental cars that he incurred as a result of the Defect.

44.    Mr. Clark viewed Mercedes's advertising materials touting the reliability of its vehicles and relied on these advertisements in making his purchase

decision. Nowhere in these advertisements did Mercedes disclose the Defect. Had

Mercedes disclosed the Defect, Mr. Clark would not have purchased his vehicle or

would have paid significantly less for it.

45.    Mr. Clark's vehicle has also suffered diminution in value due to the

Defect and the resulting loss in his vehicle's resale value.

*Plaintiff Keith Colwell (Texas)*

46.    Plaintiff Keith Colwell is a resident of Dallas, Texas.

47.    Mr. Colwell is the owner of a 2015 Mercedes GLK-350, which he

bought on from Park Place Volvo in Dallas, Texas in June 2022.

48.    Mr. Colwell's vehicle was manufactured, sold, distributed, advertised,

marketed, and warranted by Mercedes, and bears the Vehicle Identification No.

WDCGG5HB3FG402232

49.    Mr. Colwell purchased the vehicle for his personal, family, and

household use.

50.    Mr. Colwell expected his vehicle to be of good and merchantable

quality and not defective. He had no reason to know, or expect, that the Electrical

System Defect would unexpectedly drain his battery and render his car inoperable,

nor was he aware from any source prior to purchase of the repeated, ineffective,

and costly "repairs" Mercedes suggests are necessary to operate his vehicle.

51.     Since Mr. Colwell purchased his vehicle, the batteries have unexpectedly drained, requiring him to replace the batteries multiple times before the end of the useful life of the batteries. In about June 2022, Mr. Colwell replaced the auxiliary battery in his vehicle after his mechanic recommended a replacement during an annual tune-up. In about February of 2023, Mr. Colwell performed at at-home battery test that recommended replacement. He took the vehicle to a mechanic, who confirmed the test and replaced the battery.

52.     Mr. Colwell has incurred expenses associated with the Defect, including the out of pocket cost of replacing the batteries. These costs include approximately $120 replacing the auxiliary battery in June 2022 and $250 incurred for testing and replacement of the battery in February 2023.

53.     Based on experience with his last battery and the nature of the Defect, Mr. Colwell is likely to suffer more battery failures.

54.     Mr. Colwell viewed Mercedes's advertising materials touting the reliability of its vehicles and relied on these advertisements in making his purchase decision. Nowhere in these advertisements did Mercedes disclose the Defect. Had Mercedes disclosed the Defect, Mr. Colwell would not have purchased his vehicle or would have paid significantly less for it.

55.    Mr. Colwell's vehicle has also suffered diminution in value due to the Defect and the resulting loss in his vehicle's resale value.

*Plaintiff Teresa Isom (California)*

56.    Plaintiff Teresa Isom resides in Sacramento, California.

57.    Ms. Isom is the owner of a 2010 Mercedes S-500, which she bought from All Cars & Truck in North Highlands, California in September 2020.

58.    Ms. Isom's vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the Vehicle Identification No. WDDNG7BB9AA293584.

59.    Ms. Isom purchased the vehicle for her personal, family, and household use.

60.    Ms. Isom expected her vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the Electrical System Defect would unexpectedly drain her battery and render her car inoperable, nor was she aware from any source prior to purchase of the repeated, ineffective, and costly "repairs" Mercedes suggests are necessary to operate her vehicle.

61.    In December of 2022, the vehicle failed to start while parked in her driveway. She and her husband jump-started the vehicle and took it to All Cars and Trucks, which replaced the battery.

62.    Ms. Isom has incurred expenses associated with the defect, including approximately $251 for the cost of replacing the battery.

63.    Based on experience with her last battery and the nature of the Defect, Ms. Isom is likely to suffer more battery failures.

64.    Ms. Isom viewed Mercedes's advertising materials touting the reliability of its vehicles and relied on these advertisements in making her purchase decision. Nowhere in these advertisements did Mercedes disclose the Defect. Had Mercedes disclosed the Defect, Ms. Isom would not have purchased her vehicle or would have paid significantly less for it.

65.    Ms. Isom's vehicle has also suffered diminution in value due to the Defect and the resulting loss in her vehicle's resale value.

*Plaintiff Muhammed Jackson (Minnesota)*

66.    Plaintiff Muhammed Jackson resides in Dallas, Texas.

67.    Mr. Jackson is the owner of a 2010 Mercedes C-300 4Matic, which he purchased from Autos Online in Fridley, Minnesota in March 2017.

68.    Mr. Jackson's vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Mercedes, and bears the Vehicle Identification No. WDDGF8BB8AR116026.

69.    Mr. Jackson purchased the vehicle for his personal, family, and household use.

70.    Mr. Jackson expected his vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the Electrical System Defect would unexpectedly drain his battery and render his car inoperable, nor was he aware from any source prior to purchase of the repeated, ineffective, and costly "repairs" Mercedes suggests are necessary to operate his vehicle.

71.    Mr. Jackson recalls the car failing to start on many occasions, requiring at jump at least twenty times. This eventually became so frequent that he purchased a jump booster to allow him to jump start the car without another vehicle. He also purchased a home charger to try to mitigate the problem. In April of 2023, he moved to Dallas, Texas, where he purchased a separate vehicle for primary use, because of the frequency with which his Mercedes vehicle was failing to start. Mr. Jackson eventually gave the vehicle to his daughter, who keeps it in her garage on base at Fort Johnson, Louisiana.

72.    Since Mr. Jackson purchased his vehicle, the battery has frequently unexpectedly drained, including while he was away from his home. As a result, he has had to replace the battery multiple times before the end of the expected life of

the batteries since. On multiple occasions, Mr. Jackson has had to connect the battery to a charger in order to use the car.

73.    Mr. Jackson has incurred expenses as a result of the Defect, including approximately $339.74 in battery replacement costs, and $1163.55 in costs related to replacing the alternator in an attempt to repair the Defect.

74.    Mr. Jackson viewed Mercedes's advertising materials touting the reliability of its vehicles and relied on these advertisements in making his purchase decision. Nowhere in these advertisements did Mercedes disclose the Defect. Had Mercedes disclosed the Defect, Mr. Jackson would not have purchased his vehicle or would have paid significantly less for it.

75.    Mr. Jackson's vehicle has also suffered diminution in value due to the Defect and the resulting loss in his vehicle's resale value.

*Defendant Mercedes-Benz USA, LLC*

76.    Defendant Mercedes-Benz USA, LLC ("MBUSA") is a Delaware corporation with its principal place of business in Atlanta, Georgia.

77.    MBUSA is a wholly owned subsidiary of Mercedes-Benz Group AG f/k/a MBG AG.

*At all times relevant herein, MBUSA has been and has acted as an agent of MBG and subject to MBG's control.*

78.    At all times relevant herein, MBUSA (itself and through its related entities) engaged in the business of marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, throughout the United States.

*Defendant Mercedes-Benz Group AG f/k/a MBG AG*

79.    Defendant Mercedes-Benz Group AG ("MBG") f/k/a MBG AG is a German corporation with its principal place of business in Stuttgart, Germany.

80.    At all times relevant herein, MBG (itself and through its related entities) engaged in the business of designing and manufacturing the Class Vehicles.

81.    Upon information and belief, MBG was solely responsible for designing the Class Vehicles, including their defective Electrical System, and therefore is an essential party to this action concerning a design defect in the Class Vehicles' Electrical System.

82.    Upon information and belief, MBG has, and at all relevant times had, the contractual right to exercise, and in practice has exercised, control over MBUSA's work, including but not limited to the design of Class Vehicles, the manner of Class Vehicles' marketing, the scope of express warranties, the scope of

repairs in practice to be covered under warranty, and representations made and

facts withheld from consumers and the public about the Electrical System Defect.

83.    MBG has held MBUSA out as its agent for all purposes in the United

States, but especially for sales and marketing of Class Vehicles and for ongoing

management of relationships with purchasers and lessees of Class Vehicles. It

established MBUSA as its wholly-owned subsidiary company. It named MBUSA

with its official "Mercedes-Benz" title. It provided MBUSA with marketing and

technical materials avoiding any distinction between MBUSA and MBG, and

instead representing MBUSA as nothing less than MBG's presence in the United

States for purposes of selling and leasing "Mercedes-Benz" brand vehicles and

providing related services.

84.    Based on the foregoing actions, representations, and omissions,

Plaintiffs and Class Members justifiably relied on MBUSA's representations

regarding the Class Vehicles that were the responsibility of MBG in, for example,

MBG's design of the Class Vehicles, and were injured because of their purchase or

lease of defective Class Vehicles.

## III.    JURISDICTION

### *Subject-matter jurisdiction*

85.    This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(d) (the Class Action Fairness Act): the amount in controversy exceeds $5,000,000, and Defendant MBG is a citizen of a foreign country, and is thus diverse from Plaintiffs and Class Members. Pursuant to LR23.1(A)(2)(f), damages will aggregate to more than $5,000,000 because at least hundreds of thousands of Class Vehicles nationwide are affected.

*Personal jurisdiction: MBUSA*

86.    This Court has personal jurisdiction over MBUSA because MBUSA is authorized to do business in this District, conducts substantial business in the District, has its headquarters and principal place of business in the District, is at home in the District, and some of the actions giving rise to the complaint took place in the District. Each of these facts independently, but also all of these facts together, are sufficient to render the exercise of jurisdiction by this Court over MBUSA permissible under traditional notions of fair play and substantial justice.

87.    This Court also has personal jurisdiction over MBUSA under 18 U.S.C. § 1965 because MBUSA is found in, has an agent in, or transacts business in this District.

*Personal jurisdiction: MBG*

88.    This Court has personal jurisdiction over MBG because MBG has continuous and systematic general business contacts in this District.

89.    By headquartering its wholly owned subsidiary MBUSA in this District, and using MBUSA as its channel for marketing, distributing, warranting, selling and leasing the MBG-designed Class Vehicles in the District and the United States, MBG itself has deliberately taken affirmative steps to make MBG-designed vehicles available to consumers in the District and the rest of Georgia, including Plaintiffs and Class Members; created continuing obligations between MBG and residents of the District; and purposefully availed itself of the benefits and protections of conducting business in the District.

90.    MBG employees and representatives regularly visit MBUSA, which has its headquarters in Atlanta, thereby continuously conducting business in this District.

91.    Further, MBG's wholly owned subsidiary MBUSA is at home in this District, and MBUSA's contacts in this District can be attributed to MBG.

92.    Plaintiffs' claims here arise out of MBG's contacts with this District, particularly in that Plaintiffs could not even have purchased/leased their Class Vehicles if not for MBG's intentional acts of designing the Class Vehicles (including their defective Electrical Systems) and exporting them for sale to

customers in this District and the rest of the United States, including Plaintiffs and Class Members.

93.    These constitute sufficient bases to render the exercise of jurisdiction over MBG by this Court permissible under traditional notions of fair play and substantial justice.

## IV.    VENUE

94.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants, as corporations, are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

95.    Additionally, Defendants transact business within the District, MBUSA has its principal place of business in this District, and some of the events establishing the claims occurred in this District.

## V.    APPLICABLE LAW

96.    Plaintiffs seek damages and equitable relief on behalf of themselves and the Class Members under Georgia law, or, in the alternative, under California, Connecticut, Minnesota, or Texas as to the state-law claims.

## VI.    FACTUAL ALLEGATIONS

### A.    The Electrical System Defect.

97.    The battery is an essential component of any vehicle's electrical system. It provides the energy needed to start the engine and provides power for

vehicle components, including vital safety systems. In some models, it helps power the vehicle.

98.    The Electrical System Defect ("Defect") at issue in this case is as follows: The Class Vehicles are all equipped with a variety of electrical bus communication systems, including Controller Area Network bus ("CAN bus"), Local Interconnect Network ("LIN"), Media Oriented Systems Transport ("MOST"), and FlexRay. Energy management is achieved via communications on the CAN bus between computer modules that, under normal operating conditions, communicate and/or control various sensors and signal acquisition modules throughout the Vehicle. Signals sent and received via the CAN bus system from switches, sensors, and controllers facilitate drawing and distributing battery power and activating and deactivating components (including, for example, battery decoupling devices[3]). These functions are intended to regulate current draw and ensure that the vehicle retains sufficient battery charge to start under normal operating conditions. The Defect causes accessories and sensors that should receive a CAN bus signal instructing them to power off when the vehicle is turned off to instead remain active, drawing current from the battery at an unreasonably

---

[3] Mercedes's battery decoupling devices are sometimes referred to as the "Battery Disconnect Switch" or "F32k2 Quiescent Current Cutoff Relay," which, on information and belief, are functionally identical parts.

high rate. This drains the battery unnecessarily, resulting in depleted batteries that must be replaced prior to the end of their ordinary, useful life and/or renders vehicles unexpectedly inoperable.

99.    In addition to causing drivers to incur sudden expenses (*e.g.*, roadside assistance, mobile jump packs, maintainer/trickle chargers, diagnostics, and battery replacements), the Electrical System Defect can leave drivers stranded in potentially unsafe circumstances.

100.    Ultimately, the Electrical System Defect renders many Class Vehicles unreliable under intended and expected under use and conditions.

**B.    Mercedes Knew of the Electrical System Defect Prior to Sale or Lease of the Class Vehicles.**

101.    On information and belief, prior to the manufacture and sale of the Class Vehicles, Mercedes knew of the Electrical System Defect through, or as evidenced by, sources such as pre-release design and testing information; lemon law panel decisions; technical service bulletins; service center data; replacement part sales data; early consumer complaints made directly to Mercedes, collected by NHTSA ODI, and/or posted on public online vehicle owner forums; testing done, including testing in response to consumer complaints; aggregate data from Mercedes dealers; and other internal sources unavailable to Plaintiffs without discovery.

**C.    Pre-Release Design And Testing**

102.    Mercedes also knew or should have known about the Electrical System Defect because of the large number of Electrical System diagnostics, services, repairs, and battery replacements made during the Class Vehicles' warranty periods.

103.    During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles, Mercedes necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicles' Electrical Systems, particularly the basic engineering principles behind the construction and function of the Systems and the expected conditions and uses the Systems would encounter in ordinary customer service.

104.    An adequate pre-release analysis of the design, engineering, and manufacture of the Electrical Systems in the Class Vehicles would have revealed that the Class Vehicles suffered from an Electrical System Defect that caused the parasitic drain of the vehicle's battery.

**D.    Mercedes Knew of the Electrical System Defect From Its Own Service Center Data.**

105.    Mercedes also knew or should have known about the Electrical System Defect because of the large number of Electrical System diagnostics,

services, repairs, and battery replacements made during the Class Vehicles'

warranty periods.

106.    Upon information and belief, Mercedes collects, reviews, and

analyzes detailed information about repairs made on vehicles still under warranty

at its dealerships and service centers, including the type and frequency of such

repairs. Complete data on such repairs is exclusively within Mercedes's control

and unavailable to Plaintiffs without discovery.

**E.    Mercedes Knew of the Electrical System Defect Based on Its
Receipt of Large Numbers of Orders for Replacement Batteries.**

107.    Upon information and belief, Mercedes also knew or should have

known about the Electrical System Defect because of the higher-than-expected

number of replacement batteries ordered from Mercedes, which should have

alerted Mercedes that the Electrical System Defect existed and affected a wide

range of its vehicles.

108.    Upon information and belief, Mercedes-authorized service centers use

replacement parts that they order directly from Mercedes. Therefore, Mercedes

would have detailed and accurate data regarding the number and frequency of

replacement part orders, including replacement batteries. The ongoing high sales

and warranty claims of replacement batteries was (or should have been) known to

Mercedes, and alerted Mercedes that its Electrical Systems were defective and rendering Class Vehicles' inoperable.

**F.    Mercedes Knew of the Electrical System Defect from Its Own "Local Informations" (Technical Service Bulletins).**

109.    Mercedes's knowledge of the Electrical System Defect is also evident in the serial instructions it has provided its service personnel to address common complaints of battery drains and failures. On information and belief, when a significant number of owners of a particular type of vehicle report problems to dealerships, Mercedes's engineering personnel, primarily in Germany, open a root cause investigation. Investigators typically operate in siloes focused on particular vehicle models and do not consider the problem holistically, as they should. This leads to a patchwork of ineffective "fixes." Investigators offer instructions to service personnel, called "Local Informations,"[4] that address only battery drain and failures caused by particular vehicle components in particular vehicle types, rather than address why battery energy management is failing in all vehicle types generally —*i.e.*, the systemic Defect. As explained in the section that follows, when Mercedes's investigators have occasionally worked cross-functionally, they do identify the Defect and, in fact, did propose a systemic countermeasure in 2015

---

[4] "Local Information" is the term Mercedes uses for technical service bulletin: instructions provided to field personnel on how to address problems.

known as "Deep Discharge Protection." However, again, as explained below, that countermeasure is unreliable.

110.   Illustrative is Local Information "LI54.10-P-064762," first issued on October 3, 2017, and entitled "Battery Discharged, Vehicle Does Not Start - Event Code U116000 'A Bus Keepawake Event Has Been Detected' Is Logged in the Quick Test." The Local Information observed, for a large variety of vehicles, that the "battery [was] discharged," and the "vehicle does not start." Mercedes acknowledged that various functions could be drawing power through the CAN bus when they should not. Mercedes suggested local band-aids to a systemic defect: limited software flashes, replacing a failed control unit, and charging the battery. Mercedes indicated that should these measures fail to resolve the problem, service personnel should communicate with Mercedes's engineering staff and provide diagnostic testing results, suggesting Mercedes understood it has not solved the problem.

111.   Another example is Local Information "LI54.10-P-066344," issued on October 27, 2017, and entitled "Vehicle does not start, battery discharged." The Local Information states: "Vehicle does not start, battery discharged. The on-board electrical system data indicates a high discharge in the engine-off cycle; 'CAN bus awake unusually long', 'Charge balance UNUSUAL.'" It identifies two potential

causes for the CAN bus staying awake: the instrument cluster and a wireless communication module, illustrating that the CAN bus communication system is failing to ensure that functions that should be powered off when the ignition is off actually remain powered off. Again, Mercedes suggested limited band-aids while neglecting to address the wider systemic Defect. And, again, Mercedes indicated that should these measures fail to resolve the problem, service personnel should communicate with Mercedes's engineering staff and provide diagnostic testing results, suggesting Mercedes understood it has not solved the problem.

112.   On information and belief, Mercedes's engineering personnel have fielded a significant number of inquiries from dealership service personnel who have been unable to address the Electrical System Defect by employing the strategies outlined in Mercedes's Local Informations.

### G.   Mercedes Own Failed Countermeasure to the Electrical System Defect: "Deep Discharge Protection."

113.   In its eventual attempt to more widely address the persisting Electrical System Defect, Mercedes began introduction in new vehicles of a countermeasure in approximately 2015 termed "Deep Discharge Protection." On information and belief, this feature was implemented in response to years of complaints about and internal investigations of the Defect. A September 2015 technical introduction manual explained that this "new feature . . . is intended to prevent impermissible

discharging of the battery at a standstill"—exactly the Defect that affects Class Vehicles. Mercedes explained that, "[f]or the first time, the system aims to minimize elevated no-load currents due to faulty components by performing hardware resets through opening and re-closing the battery disconnect switch (in the front prefuse box)," and "[t]he battery disconnect switch is only opened on a permanent basis by the on-board electrical system management function if the critical battery charge level is undershot." To be clear, Mercedes was aware of the defect long before it introduced Deep Discharge Protection, and required a significant amount of time to develop the system. Before introducing Deep Discharge Protection, Mercedes had not treated the defect for what it is – a problem across its vehicles.

114.   In the years following 2015, Mercedes implemented Deep Discharge Protection in all its new vehicle models. But, notably, Mercedes has not advertised the Deep Discharge Protection system to its customers because to do so would be to acknowledge the Electrical System Defect that Mercedes continues to conceal from customers, lest its reputation for vehicle performance and reliability—which enables Mercedes to command high prices for its vehicles—be harmed.

115.   By 2022, the roll-out of Deep Discharge Protection was complete across all Mercedes vehicles. In a December 2022 update to its technical

information system, Mercedes indicated to its service personnel that Deep

Discharge Protection was operational in all new vehicles. The system function was

described as follows:

- If the system detects what it terms "increased quiescent current"—*i.e.*, current draws while the vehicle is stationary—"it attempts to reset the reason causing it by disconnecting the on-aboard electrical system battery from the on-board electrical system." Specifically, all electrical functions on Circuit 30t (most electrical functions) are disconnected from the power supply. Then, "after a defined period of time, the on-board electrical system battery is connected again to the on-board electrical system." This procedure—cutting off power and then restoring power—is akin to a system reset.

- The system reset occurs two more times if quiescent current is detected. If quiescent currents are still detected after the third reset, the system allows the current draws to persist.

- Then, if "the charge level of the on-board electrical system battery drops below 40%," the system "disconnects the on-board electrical system battery from the on-board electrical system" permanently to preserve the ability of the battery to start the vehicle.

116.    Despite the introduction of Deep Discharge Protection, Mercedes

continues to face significant battery replacement claims and customer complaints

to dealerships of no-start conditions in Class Vehicles equipped with the

countermeasure. On information and belief, Mercedes's engineers' investigation of

these continued problems has reaffirmed the existence of the Electrical System

Defect and the insufficiency of Deep Discharge Protection as only the most recent,

and failed, effort to patch the Defect.

117.    Because Deep Discharge Protection is unreliable, on July 20, 2022, Mercedes issued yet another illustrative Local Information "LI54.10-P-071832," entitled "Vehicle cannot be unlocked/vehicle does not start—starter battery discharged." The Local Information specifically applies to three recent vehicle types equipped with the Deep Discharge Protection system. Mercedes identified six different vehicle modules that could be causing a CAN "bus keepawake" error. Mercedes suggested software updates, clearing fault codes, and leaving the vehicle undriven for 24 hours. Mercedes indicated that should these measures fail to resolve the problem, service personnel should communicate with Mercedes's engineering staff and provide diagnostic testing results, once again suggesting Mercedes understood that it did not have a comprehensive solution to the Defect.

**H.    Mercedes Knew of the Electrical System Defect from Class Member Complaints Made Directly to Mercedes and/or Collected by NHTSA's Office of Defect Investigations.**

118.    Mercedes also knew or should have known about the Electrical System Defect because numerous consumer complaints regarding failures of the Electrical System were made directly to Mercedes. The large number of complaints, and the consistency of their descriptions alerted or should have alerted Mercedes to this serious defect affecting a wide range of its vehicles.

119.    Federal law requires automakers like Mercedes to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

120.    Thus, automakers should and do monitor NHTSA databases for consumer complaints regarding their automobiles as part of the automakers ongoing obligation to identify potential defects in their vehicles, including design-related defects, such as Electrical System failures.

121.    From its monitoring of the NHTSA databases, Mercedes knew or should have known of the many complaints about Electrical System failures logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, Mercedes to the Electrical System Defect.

122.    Further, the full universe of complaints made directly to Mercedes about the Electrical System Defect is information presently in the exclusive custody and control of Mercedes and is not yet available to Plaintiffs prior to discovery. However, upon information and belief, many Class Vehicle owners complained (and continue to complain) directly to Mercedes and Mercedes

dealerships about the repeated Electrical failures their vehicles experienced. For

example, some instances of these complaints are described in Class Vehicle

owners'/lessees' complaints logged with NHTSA ODI:[5]

- "Car battery dies if vehicle not driven often and/or for longer distances. This was not explained at time of sale nor does manual mention. There is no warning light that battery is low. No fix. Told I should hook up to trickle charger." NHTSA ID No. 11321182, date of incident March 16, 2020 (vehicle model: 2018 GLA250).

- "The Battery keeps draining, appears to be a design defect. Vehicle model Mercedes GLA250 - 2018 Battery light came ON and car needed a jump start, take it to the dealer. Per dealer vehicle failed to crank and failed load test. Battery was removed and replaced on 20 July 2021. Miles 20,153. Invoice #417618 Again on 17 - 18th May 2022 (odometer reading 23,961) car failed to crank. Called road side assistance (Call # 2-28496306974). Battery was replaced "under warranty" Ordered Battery Tender (trickle charger) from Amazon, and on 25 May 2022 take it to the nearby mechanic to install Pre-wired to battery to enable Battery charger connection. Keep on using Battery charger to save from Draining the battery all the way. Have been doing this almost once every month." NHTSA ID No. 11487923, date of incident July 20, 2022.

- "New S500 Benz, 1700 miles on the car, 2 months on the road only. . . . Car refuses to start daily . . . . Took to the dealer, dealer says car needed to be driven more even tho[ugh] it[']s driven daily." NHTSA ID No. 11498170, date of incident December 20, 2022.

123.    As the above sampling of complaints shows, Class Vehicle owners

have been vocal in complaining directly to Mercedes about the Electrical System

---

[5] For these and other customer complaints quoted in this Complaint, those originally in all-caps have been changed to sentence case.

Defect, and the number and consistency of their complaints should have alerted

Mercedes to the existence of the Electrical System Defect.

**I.    Mercedes Knew of the Electrical System Defect Based on Class Member Complaints on Public Online Forums.**

124.   In addition to complaints made directly to Mercedes and collected by

NHTSA ODI, many Class Vehicle owners posted complaints about the Electrical

System Defect on public online vehicle owner forums. The following is a small

sampling of such complaints:

- "i have a c320 and started having battery drain problems in december last yr. i had to finally change my battery. but the problem still per[s]ists." Posted on www.mercedesforum.com in January 2008.

- Dead Battery again - 2019- garage parked my 2016 GLE350 4MATIC and locked it. Was gone for a week- came back and the car wouldn't start. Battery was completely flat. Had to call MB roadside and have my battery replaced for $300 out of pocket cost. MB tech says not normal for 4 year old battery to die. The dealer kept the car overnight to check for voltage drain etc. No issues found. NOV 2020 - 2016 GLE350 4Matic, brought my vehicle in to have the rims repaired. Dealer had the car for 5 days- parked in their lot. Went to pick up car and the mechanic couldn't start it. Had to jump it. I resisted to pick up the car and the dealer agreed to kelp it and trouble shooting it to find out why a 1 year old MB battery would die in a parked vehicle. JAN-2020- my wife's 2017 GLC300 was locked and parked for 5 days. Came back and battery was totally flat. Mercedes replaced under warranty.
  We always check the interior and exterior of the vehicle before locking it and leaving it parked in the garage. Too many coincidences for these MB batteries to go totally flat in about a week. This is not normal. Has anyone else experienced this ?
  We live in a warm climate state. Weird, we've never had problems

with batteries in previous vehicles. We are uncomfortable to leave our vehicles parked for a week now. It's such a hassle to deal with dead batteries. Posted on mbworld.org in November 2020.

- "I have a Mercedes E-320 2004. I have a new battery and alternator works fine. After I drive my car for a while- the battery will drain rapidly overnight. I had a mechanic check for a draw and he found none. Now here is the weird thing. I have installed a cut off switch to the negative side of battery. If after I drive my car and switch off the battery and quickly reconnect it-the draw stops and does not drain battery ever. If after driving again and I don't do this it will rapidly discharge again. Any ideas please?"  Posted on www.community.cartalk.com in February 2019.

- "I have a 2016 W212R E550 Sedan. … After changing both the primary battery in the hood and the auxiliary battery under the driver side as well as the fuse, the car seemed to be perfectly fine but the car's battery dies every other day since then. Alternator is perfect as well, no faults in the system either. Does anyone know what the problem could be or have experienced this before?  Also, when boosting the car now, you need to let it sit to a proper connection or jumper for 5-10 minutes in order to start it or else it won't start. Lights and other functions turn on but the car doesn't have enough power to turn on. Posted on mbworld.org in March 2020.

- "Okay, so first of all... my 2014 350 drains the battery at (what I feel) is an accelerated rate. If it sits for more than three days, the battery will drain to the point of not starting. I've had MB check the battery and they claim it's A-OK."  Posted on www.slkworld.com in February 2017

- "For some reason when my car sits for more than 2 days the battery is dead. Everything in the car is shut off but the battery keeps dying. Any thoughts? Oh yea both batteries are less than 4 months old." Posted on mbworld.org in December 2009.

- "I have this problem for a long time now if the if the car seats for 4 o 5 days the battery will go dead. Now the only way that that won't

happen is the battery if brand new, but after 5 or 6 month this will happen." Posted on www.benzworld.org in April 2021.

- "My battery keeps draining. I've replaced 2 batteries now." Posted on www.benzworld.org in January 2010.

- "This car has had a battery drain 'fault' since bought new: 2003. MB agents over the years have INSISTED it was always the battery - till I put my foot down. ......5 batteries in 8 years?" Posted www.benzworld.org in March 2014.

- "Relatively quick battery drain. The battery checks out fine; but when connected it drains in two or three days of not driving." Posted on www.cargurus.com in May 2019.

- "Low Mil[e]age [8000] car, Battery drains to nothing. three times within a month. Can't start car." Posted on www.repairpal.com in January 2011.

- "Got a new 2020 GLE350 about 3 months ago About a week ago, it would not start, bunch of lights on the dash, would not turn over MB sent out a service and they jumped the car It ran for another week, and then just died again. We had it towed to MB this time Already checked the Battery and Alternator all are fine Any idea what is causing the battery drain" Posted on mbworld.org/forums/ in June 2020.

- "I have been having problems with my E class. for the past month there has been a parasitic drain it has been in and out of the dealership but it still keeps draining and its unable to start. Its temperamental and happens at random times." Posted on mbworld.com in February 2021.

- "Okay I got an update. No resolution and more annoyed than before. I drop the car off, it has a 12V battery message on the dash I get a call from the service advisor and they're like yeah it's odd we will keep it over night and check it out. So they run their tests battery checks out good 😊 her suggestion is to drive the car more ( I drive it everyday 2hrs plus ) or get a trickle charger ( sure, okay if I let it sit for a week.

- 37 -

It's not an EV I shouldn't have to plug it in over the weekend )"
Posted on mbworld.org/forums/ in February 2022.

As shown by this small sampling of complaints from websites such as

www.mbworld.com, www.benzworld.org, www.repairpal.com,

www.community.cartalk.com, www.cargurus.com, www.slkworld.com, and

www.mercedesforum.com, consumers have been vocal in complaining about the

Electrical System Defect and the damage being caused by the Defect. A multi-

billion dollar vehicle design and manufacturing company such as Mercedes

undoubtedly tracks and has tracked such sites and was aware or should reasonably

have been aware of the Electrical System Defect in the Class Vehicles.

**J.    Mercedes Knew of the Electrical System Defect Based on Lemon Law Decisions.**

125.    In *Lisa Mayer v. Mercedes-Benz USA, LLC*, June 24, 2013, Florida

New Motor Vehicle Arbitration Board # 2012-0058-STP, Shop Foreman at

Mercedes Benz of Sarasota, Abel Grijalva in testifying for Mercedes admitted that

"short timespan" drains "weaken the battery significantly," stating, "the battery

would not maintain a proper charge anymore, you can only discharge so many

times and recharge it so many times so once it's reached so many discharges it

wont recharge to the proper level," he also stated that, "Every instance of battery

drain requires an extended recharge period," "in these occurrences you have

weakened the battery." He also stated that a battery can be discharged and still "start up" but then fail shortly later. Thus, battery drain events are a downward cycle towards more failures.

126.   In *Chad Prandi v. Mercedes-Benz USA, LLC*, June 24, 2013, Florida New Motor Vehicle Arbitration Board # 2013-0024/WPB, the Board ordered Mercedes replace or repurchase the 2011 E550 that exhibited low battery no start conditions under Lemon Law, finding that, "The evidence established that the ongoing problem with the battery dying substantially impairs the use, value and safety of the vehicle, and the intermittent failure of the air suspension system substantially impaired the use, value and safety of the vehicle, thereby constituting one or more nonconformities as defined by the statute and the applicable rule. The Manufacturer's assertion to the contrary is rejected." In that case, "Todd Banks, Service Director at Mercedes-Benz of Fort Lauderdale, testified "something" must be drawing from the battery, but he never found an electrical problem to explain why the battery keeps dying. He replaced the battery sensor as a preventative measure, but the battery still died afterwards. Mr. Banks agreed it was not common to replace or jump start a battery so many times in two years." As such, Mercedes was on notice that this is a substantial impairment and issue with its vehicles its Authorized Service Centers are unable to resolve.

127.   In *Hisham Boulhimez v. Mercedes-Benz USA, LLC*, January 2021, Florida New Motor Vehicle Arbitration Board # 2020-0413/WPB, Mercedes reached a settlement prior to formal hearing with a consumer seeking Lemon Law repurchase of a 2019 C63 due to low battery no start conditions after two attempts to repair the issue took 35 days and which an initial repair resulted in another failure to start the same day it was deemed repaired. The dealer found battery drain by the Electronic Ignition Switch. As such, Mercedes was on notice that this is a substantial impairment and frustrating issue to resolve.

\*          \*          \*

128.   In sum, as early as 2003, possibly earlier, and certainly by model year 2009, Mercedes was aware of the Electrical System Defect, should have been aware of the Electrical System Defect through the exercise of reasonable care, and/or was negligent in failing to be aware of the Electrical System Defect, based on, among others, the following sources:

- Pre-release design and testing;

- Numerous and consistent vehicle owner complaints made directly to Mercedes about the Electrical System Defect;

- Detailed data gathered by Mercedes about the large number of Electrical System Defect servicing occurrences;

- Mercedes service center employees' familiarity with and knowledge of the Electrical System Defect;

- Mercedes's knowledge of the large number of replacement batteries ordered from Mercedes;

- Local Informations evincing knowledge of battery failures issued by Mercedes to its dealerships and service centers;

- Development and implementation of an ultimately failed countermeasure aimed at preserving battery function: Deep Discharge Protection;

- Numerous and consistent vehicle owner complaints collected by NHTSA ODI about the Electrical System Defect; and

- Numerous and consistent vehicle owner complaints made on online vehicle owner forums.

129.    Moreover, the large number and consistency of Class Member complaints describing battery failures underscores the fact that Class Members considered the Electrical System Defect to be a material issue to the reasonable consumer.

## VII.  APPLICABLE WARRANTIES

130.    Mercedes sold Class Vehicles with an express warranty of 4 years or 50,000 miles that it not only advertises to its purchasers widely through media channels, but also states in writing, without exclusions, on vehicle window labels (known as "Monroney stickers") at dealerships.

131. Any caveats, limitations, or "asterisks" to such coverage were never disclosed to Plaintiffs.

132. Plaintiffs and Class Members could not assent to any disclaimers or limitations on its new vehicle warranty because Mercedes's customers (Plaintiffs and Class Members) only received such terms after the delivery of Mercedes's vehicles.

133. Mercedes prevents Plaintiffs and Class Members from assenting to any disclaimers or limitations on its new vehicle warranties by including such terms in a cellophane-plastic-sealed warranty booklet that is only presented to Plaintiffs and Class Members until after the vehicle delivery.

134. Mercedes post-sale-and-delivery disclaimers and limitations on its vehicle warranties are ineffectual because such terms go to the essence of Plaintiffs and Class Members' vehicle sale or lease contracts.

135. Based on Plaintiffs' experiences and reports from other consumers, Mercedes refuses to cover the nonpermanent "fixes" under warranty, and instead requires Class Members pay out of pocket for these nonpermanent "fixes" for the Electrical System Defect even if Class Members' vehicle remained under warranty at the time.

## VIII.  MERCEDES MARKETING AND CONCEALMENT

136.   Upon information and belief, Mercedes knowingly manufactured and sold the Class Vehicles with the Electrical System Defect, while willfully concealing the true inferior quality and sub-standard performance of the Class Vehicles' electrical system.

137.   Mercedes directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media.

138.   Mercedes marketing material describes the various Class Vehicles as "state-of-the-art," "fine craftsmanship," and "the most advanced vehicles on the road." Mercedes's slogan for its vehicles is "the best or nothing."

139.   In particular, Mercedes describes its vehicles as "technologically advanced" and "fine-tuned" to provide "unparalleled performance" that "live up to exacting requirements and relentless excellence" and that "show no weakness."

140.   Although Mercedes knew of its vehicles' electrical systems' propensity to cause unexpected battery drain and failure, it refused to notify Plaintiffs and Class Members of this prior to their vehicle purchases.

141.   Mercedes marketing materials and manuals advertised and described its vehicles as, "A Mercedes-Benz SUV likes to overachieve, outperform, and

overdeliver," "What you'll have a really hard time finding is anything that's been overlooked by its engineers, designers and craftspeople," "It takes driving convenience and passenger comfort into a new generation—along with confidence, connectivity and capability," and "Mercedes-Benz is also legendary for producing automobiles of extraordinary durability and longevity."

142.   It also promoted videos stating its vehicles are "engineering excellence" and "an automotive masterpiece." This led Plaintiffs and Class Members to form a reasonable belief and expectation that their vehicles' electrical systems would function reliably to start and power their Vehicles and caused a reasonable consumer not to expect that the vehicle would fail to start and unexpectedly and them stranded.

143.   In practice, the Class Vehicles are not of the quality and reliability that Mercedes's marketing represents. Mercedes concealed the fact that its Class Vehicles, which supposedly are "the most advanced vehicles on the road," are instead not even reliable enough to start after a night in the driveway or garage.

144.   Plaintiffs and Class Members were exposed to Mercedes's long-term, national, multimedia marketing campaign touting the supposed reliability and quality of the Class Vehicles, and Class Members justifiably made their decisions

to purchase/lease their Class Vehicles based on Mercedes's misleading marketing that concealed the true, defective nature of the Class Vehicles' Electrical System.

145.   To be clear, Plaintiffs do not bring affirmative misrepresentation claims. However, Mercedes's longstanding practice of marketing its vehicles across many marketing channels as advanced, state-of-the-art, unparalleled, etc. illustrates the many instances in which Mercedes should have disclosed the Defect because the existence of the Defect runs counter to its brand identity. And, as detailed above, upon information and belief, Mercedes has been aware of the Electrical System Defect since at least 2003, possibly earlier, and certainly by model year 2009, through pre-release design and testing; technical service bulletins, the high number of Electrical System servicing occurrences and replacements, and the numerous and consistent complaints about the Electrical System Defect made directly to Mercedes, collected by NHTSA and posted in public online forums.

146.   Further, Mercedes knowingly misled Class Members about the true, defective nature of the Class Vehicles even when they raised concerns. Despite Mercedes's knowledge of the Defect, Mercedes told Class Members who called its customer service about the Electrical System Defect that their batteries and vehicles were fine, and made Class Members pay for temporary "band aid"

diagnostic and repair measures out-of-pocket. And, to the extent Mercedes provided any repairs or service under warranty, it has not permanently resolved the problem and thus failed to meet its warranty obligation.

147.    In sum, Mercedes has actively concealed the existence and nature of the Electrical System Defect from Class Members since at least 2003, possibly earlier, and certainly by model year 2009, despite its knowledge of the existence and pervasiveness of the Electrical System Defect, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles. Specifically, Mercedes has:

- Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Electrical System Defect;

- Failed to disclose, at and after the time of purchase, lease, and/or service, that the Class Vehicles' Electrical Systems were defective and not fit for their intended purposes;

- Failed to disclose, and actively concealed, the fact that the Class Vehicles' Electrical Systems were defective, despite the fact that Mercedes learned of the Electrical System Defect as early as 2003, possibly earlier, and certainly by model year 2009;

- Failed to disclose, and actively concealed, the existence and pervasiveness of the Electrical System Defect even when directly asked about it by Class Members during communications with Mercedes, Mercedes Customer Assistance, Mercedes dealerships, and Mercedes service centers; and

- Actively concealed the Electrical System Defect by forcing Class Members to bear the cost of temporary measures to address the battery failures, while other dealerships replaced batteries at no charge to the owner;

148. By engaging in the conduct described above, Mercedes has concealed, and continues to conceal, the Electrical System Defect from Class Members. If Class Members had knowledge of the information Mercedes concealed, they would not have bought or leased the Class Vehicles, or would have paid less for them.

## IX. FRAUDULENT CONCEALMENT ALLEGATIONS

149. Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Mercedes responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles. Mercedes necessarily is in possession of or has access to all of this information.

150. Plaintiffs' claims arise out of Mercedes's fraudulent concealment of the Electrical System Defect that caused battery failures and numerous battery replacements, and its representations about the reliability of the Class Vehicles.

151. To the extent that Plaintiffs' claims arise from Mercedes's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically at the time they purchased or leased their Class Vehicles,

Mercedes knew, or was reckless in not knowing, of the Electrical System Defect;

Mercedes was under a duty to disclose the Defect based upon its exclusive

knowledge of it, its affirmative representations about it, and its concealment of it;

and Mercedes never disclosed the Defect to the Plaintiffs or the public at any time

or place or in any manner.

152.   Plaintiffs make the following specific fraud allegations with as much

specificity as possible although they do not have access to information necessarily

available only to Mercedes:

- *Who*: Mercedes actively concealed the Electrical System Defect from Plaintiffs and Class Members while simultaneously touting the safety, reliability, and world-class quality of the Class Vehicles, as alleged in paragraphs 99-129 *supra*. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Mercedes responsible for such decisions.

- *What*: Mercedes knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Electrical System Defect, as alleged above in paragraphs 99 -129*supra*. Mercedes actively concealed the Defect and made contrary representations about the safety, reliability, and world-class quality, reliability, and other attributes of the Class Vehicles, as specified above in paragraphs 99-129 *supra*.

- *When*: Mercedes concealed material information regarding the Defect at all times and made representations about the world-class quality, reliability, and safety of the Class Vehicles, starting in 2003, possibly earlier, and certainly by model year 2009, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day, as alleged above in paragraphs 151-186,

*supra*. Mercedes has not disclosed the truth about the Defect in the Class Vehicles to anyone outside of Mercedes. Mercedes has never taken any action to inform consumers about the true nature of the Defect in Class Vehicles. And when consumers brought their Class Vehicles to Mercedes complaining of battery failures, Mercedes denied any knowledge of or responsibility for the Electrical System Defect.

- *Where*: Mercedes concealed material information regarding the true nature of the Defect in every communication it had with Plaintiffs and Class Members and made contrary representations about the world-class quality, reliability, and safety of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Mercedes disclosed the truth about the Defect in the Class Vehicles to anyone outside of Mercedes. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on Mercedes's website.

- *How*: Mercedes concealed the Electrical System Defect from Plaintiffs and Class Members and made representations about the world-class quality, reliability, and safety of the Class Vehicles. Mercedes actively concealed the truth about the existence and nature of the Defect from Plaintiffs and Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable consumer and Mercedes promised in its marketing materials that Class Vehicles have qualities that they do not have.

- *Why*: Mercedes actively concealed material information about the Defect in Class Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the world-class quality, reliability, safety of the Class Vehicles. Had Mercedes disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of it, and would not have bought Class Vehicles or would have paid less for them.

## X.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Fraudulent Concealment Tolling

153.    Upon information and belief, Mercedes has known of the Electrical System Defect in the Class Vehicles since 2003, possibly earlier, and certainly by model year 2009, and has concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the Electrical System Defect, even when directly asked about it by Plaintiffs and Class Members during communications with Mercedes, Mercedes Customer Assistance, Mercedes dealerships, and Mercedes service centers. Mercedes continues to conceal the Defect to this day.

154.    Any applicable statute of limitation has been tolled by Mercedes's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### B.    Estoppel

155.    Mercedes was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles. Mercedes actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality, world-class quality, reliability, and safety of the Class Vehicles.

Plaintiffs and Class Members reasonably relied upon Mercedes's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, Mercedes is estopped from relying on any statutes of limitation in defense of this action.

### C.    Discovery Rule

156.    The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles contained the Electrical System Defect.

157.    However, Plaintiffs and Class Members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Electrical System Defect caused their Vehicles' batteries to fail. Even then, Plaintiffs and Class Members had no reason to know the battery failures were caused by a defect in the Class Vehicles because of Mercedes's active concealment of the Electrical System Defect. Not only did Mercedes fail to notify Plaintiffs or Class Members about the Electrical System Defect, Mercedes in fact denied any knowledge of or responsibility for the Electrical System Defect when directly asked about it, and, in many instances, actually blamed the owner/lessee for causing the problem. Thus Plaintiffs and Class Members were not reasonably able to discover the Electrical System Defect until after they had purchased or leased

the Class Vehicles, despite their exercise of due diligence, and their causes of

action did not accrue until, at earliest, they discovered that the Electrical System

Defect was causing their Vehicles' batteries to fail.

## XI.    CLASS ACTION ALLEGATIONS

158.   Plaintiffs bring this lawsuit as a class action on behalf of themselves

and all other similarly situated individuals pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3), (b)(2), and/or (c)(4). This action satisfies the

numerosity, commonality, typicality, adequacy, predominance, and superiority

requirements of those provisions, as well as the requirements of Rule 23(g).

159.   Plaintiffs bring this class action on behalf of themselves and all other

similarly situated members of the proposed class (the "Class"), defined as follows:

> Consumers who purchased or leased Class S, C, A,
> CLA, CLK, CLS, G, GLA, GLK, GLC, ML, GLE, GL,
> GLS, and E vehicles for model years 2009 to present.

Excluded from the Class are: (1) Mercedes, any entity or division in which

Mercedes has a controlling interest, and its legal representatives, officers, directors,

assigns, and successors; (2) the Judge to whom this case is assigned and the

Judge's staff; (3) governmental entities; and (4) claims for personal injuries

resulting from the facts alleged herein. Plaintiffs reserve the right to amend the

Class Definition if discovery and further investigation reveal that the Class should

be expanded, divided into subclasses, or modified in any other way.

### A.    Numerosity

160.    Although the exact number of Class Members is uncertain and can

only be ascertained through appropriate discovery, upon information and belief,

Mercedes sold hundreds of thousands of Class Vehicles nationwide, making the

number great enough such that joinder is impracticable. The disposition of the

claims of these Class Members in a single action will provide substantial benefits

to all parties and to the Court. Class Members are readily identifiable from

information and records in Mercedes's possession, custody, or control, as well as

from records kept by the Department of Motor Vehicles.

### B.    Typicality

161.    The claims of the Plaintiffs are typical of the claims of Class Members

in that the Plaintiffs, like all Class Members, purchased or leased a Class Vehicle

designed, manufactured, and distributed by Mercedes. The Plaintiffs, like all Class

Members, have been damaged by Mercedes's misconduct in that they have

purchased a vehicle they would not have purchased, or for which they would have

paid less, and incurred or will incur the cost of service relating to and caused by the

Electrical System Defect. Furthermore, the factual bases of Mercedes's misconduct

are common to the Plaintiffs and all Class Members and represent a common thread of misconduct resulting in injury to the Plaintiffs and all Class Members.

### C.    Adequate Representation

162.    Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective automotive vehicles.

163.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class.

### D.    Predominance of Common Issues

164.    There are numerous questions of law and fact common to Plaintiffs and Class Members, the answers to which will advance resolution of the litigation as to all Class Members, and which predominate over any individual question. These common legal and factual issues include:

- whether the Electrical Systems in the Class Vehicles are defective;

- whether and when Mercedes knew or should have known about the Electrical System Defect;

- whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Class Vehicle;

- whether Mercedes had and/or has a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class Members;

- whether Mercedes omitted and failed to disclose material facts about the Class Vehicles;

- whether Mercedes's concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing Class Vehicles;

- whether Mercedes represented, through its words and conduct, that the Class Vehicles had characteristics, uses, or benefits that they did not actually have, in violation of state consumer protection statutes;

- whether Mercedes represented, through its words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of another, in violation of state consumer protection statutes;

- whether Mercedes advertised the Class Vehicles with the intent not to sell them as advertised, in violation of state consumer protection statutes;

- whether Mercedes active concealment of the true defective nature of the Class Vehicles was likely to create confusion or misunderstanding, and therefore fraudulent, within the meaning of state consumer protection statutes.

- whether Mercedes active concealment of the true defective nature of the Class Vehicles were and are deceptive within the meaning of the state consumer protection statutes.

- whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

- whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that the Electrical Systems in Class Vehicles are defective and/or not merchantable;

- whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

- whether Mercedes should be declared financially responsible for notifying Class Members of the problems with the Class Vehicles and for the costs and expenses of permanently remedying the Electrical System Defect in the Class Vehicles; and

- whether Mercedes is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, service, repair, or replace the defective Electrical Systems.

### E.    Superiority

165.    Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Mercedes unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

166.    Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Mercedes's misconduct. Absent a class action, Class Members will continue to incur damages, and Mercedes's misconduct will continue without remedy.

167.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## XII.   CAUSES OF ACTION[6]

### FIRST CAUSE OF ACTION
### Breach of Express Warranty
### (by Plaintiff Susanna Melanson against MBUSA only)

168.   Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

169.   Plaintiff brings this cause of action for themselves and on behalf of all Class Members.

170.   MBUSA is and was at all relevant times a "merchant" with respect to motor vehicles, and specifically the Class Vehicles, under, inter alia, O.C.G.A. § 11-2-104(1), and "sellers" of motor vehicles, and specifically the Class Vehicles, under, inter alia, O.C.G.A. § 11-2-103(1)(d); and, with respect to leases, is and was at all relevant times a "lessor" of motor vehicles, and specifically the Class Vehicles, under, inter alia, O.C.G.A. § 11-2A-103(1)(p).

---

[6] For each state law claim or issue, Plaintiffs may seek certification on behalf of Class Members from other states with sufficient similar state laws and/or, where and if appropriate, under the laws of the State of Georgia.

171.    The Class Vehicles are and were at all relevant times "goods" within the meaning of, inter alia, O.C.G.A. §§ 11-2-105 and 11-9-102(a)(45).

172.    Plaintiff and Class Members bought or leased Class Vehicles manufactured, marketed to them, and intended to be purchased by consumers such as them, by Mercedes.

173.    MBUSA expressly warranted the Class Vehicles against defects including the Electrical System Defect, as described above, within the meaning of, inter alia, O.C.G.A § 11-2-313(1).

174.    MBUSA's express warranties formed a basis of the bargain that was reached when Class Members purchased or leased their Class Vehicles; namely, that the vehicles included a 4 year/50,000 by a warranty. Any caveats, limitations, or "asterisks" to such coverage were never disclosed to Plaintiffs.

175.    Plaintiff and Class Members could not assent to any disclaimers or limitations on its new vehicle warranty because Mercedes customers (Plaintiffs and Class Members) only received such terms after the delivery of Mercedes vehicles.

176.    Mercedes prevents Plaintiff and Class Members from assenting to any disclaimers or limitations on its new vehicle warranties by including such terms in a cellophane-plastic-sealed warranty booklet that is only presented to Plaintiffs and Class Members until after the vehicle delivery.

177.   Mercedes post-sale-and-delivery disclaimers and limitations on its vehicle warranties are ineffectual because such terms go to the essence of Plaintiff and Class Members' vehicle sale or lease contracts.

178.   As described above, the Electrical System in the Class Vehicles is defective. The Electrical System Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and Class Members.

179.   MBUSA knew of the Electrical System Defect, and that this Defect poses serious safety risks to consumers like Plaintiff and Class Members, when it expressly warranted against the Defect, wrongfully and fraudulently concealed material facts regarding the Defect, failed to inform Class Members that the Class Vehicles had the Defect, and induced Plaintiff and Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

180.   Plaintiff and Class Members were either in privity with MBUSA as original purchasers or lessees, or otherwise afforded the benefits of the express warranty.

181.   MBUSA breached its express warranties by supplying the Class Vehicles to Plaintiff and Class Members with the Electrical System Defect.

182.    MBUSA is obligated, under the terms of its express warranties, to make repair and/or replacements to permanently correct the Electrical System Defect for Plaintiff and Class Members.

183.    As more fully detailed above, MBUSA was provided with appropriate notice and has been on notice of the Defect and of its breach of express warranties from various sources.

184.    The Class Vehicles were under this express warranty when they exhibited the Electrical System Defect.

185.    Plaintiff gave MBUSA a reasonable opportunity to cure its failures with respect to its warranties, and MBUSA failed to do so free of charge or at all.

186.    MBUSA breached its express warranties by failing to permanently repair the Class Vehicles and by failing to provide to Plaintiff or Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it expressly warranted when it sold the Class Vehicles to Plaintiff and Class Members.

187.    Affording MBUSA a reasonable opportunity to cure its breach of express warranties was unnecessary and futile here. When Plaintiff and other Class Members provided such notice and sought relief under the warranty, MBUSA refused to do so. Mercedes dealerships told Class Members battery replacements

were not covered by their warranties. When Mercedes dealerships did replace batteries, software, or other electrical components at no charge to Class Members, the battery drains reoccurred again. Furthermore, several Mercedes dealerships told Class Members the Defect was a known problem without a permanent fix.

188.   To the extent any express warranties do not by their terms cover the defects alleged in this Complaint, and to the extent the contractual remedy is in any other respect insufficient to make Plaintiff and Class Members whole, the warranties fail of their essential purpose and, accordingly, recovery by Plaintiff and Class Members is not restricted to the promises in any express warranties, and they seek all remedies that may be allowed.

189.   Any attempt by MBUSA to limit or disclaim the express warranties in a manner that would exclude coverage of the Electrical System Defect is unconscionable as a matter of law because the relevant purchase/lease transactions were tainted by MBUSA's concealment of material facts. Thus any such effort by MBUSA to disclaim, or otherwise limit, its liability for the Electrical System Defect is null and void. Any caveats, limitations, or "asterisks" to such coverage were never disclosed to Plaintiff because:

- Plaintiff and Class Members could not assent to any disclaimers or limitations on its new vehicle warranty because Mercedes's customers

(Plaintiff and Class Members) only received such terms after the delivery of Mercedes's vehicles.

- Mercedes prevents Plaintiff and Class Members from assenting to any disclaimers or limitations on its new vehicle warranties by including such terms in a cellophane-plastic-sealed warranty booklet that is only presented to Plaintiff and Class Members until after the vehicle delivery.

- Mercedes post-sale-and-delivery disclaimers and limitations on its vehicle warranties are ineffectual because such terms go to the essence of Plaintiff and Class Members' vehicle sale or lease contracts.

190.   As a direct and proximate result of MBUSA's breach of express warranties, Plaintiff and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including out-of-pocket costs and the costs of needed present and future repairs, in an amount to be determined at trial, and are entitled to the relief requested *infra*.

### SECOND CAUSE OF ACTION
### Breach of Implied Warranty
### (by Susanna Melanson and Linda Blackwell against MBUSA only)

191.   Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

192. When it sold its Class Vehicles, MBUSA extended an implied warranty to Class Members that the subject vehicles were merchantable and fit for the ordinary purpose for which such goods were sold.

193. Persons who purchased a vehicle from MBUSA are entitled to the benefit of their bargain: a vehicle with a non-defective Electrical System.

194. MBUSA breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use, and (2) not of a merchantable quality.

195. The Electrical System Defect negatively affects the driveability and usefulness of the Class Vehicles.

196. Had the fact that the Electrical System Defect existed been disclosed at the time of sale, the Class Vehicles could not have been sold, or could not have been sold at the same price.

197. As a direct and proximate result of MBUSA's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**Violation of California Consumer Legal Remedies Act ("CLRA")**
**(by Plaintiffs Linda Blackwell and Teresa Isom against all Defendants)**

198. Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

199. Plaintiffs bring this cause of action for themselves and on behalf of Class Members.

200. Mercedes is a "person" as defined by the CLRA. Cal. Civ. Code 149. Plaintiffs and Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

201. The purchases and leases of Class Vehicles and the warranties by Plaintiffs and Class Members constitute "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e).

202. The Class Vehicles and the warranties constitute "goods" or "services" as defined by the CLRA. Cal. Civ. Code §1761(a) and (b).

203. Plaintiffs and Class Members purchased or leased the Class Vehicles and the warranties primarily for personal, family, and household purposes as meant by the CLRA. Cal. Civ. Code § 1761(d).

204. Mercedes's misrepresentations, active concealment, failures to disclose, and omissions regarding the Class Vehicles and the warranties violated the CLRA in the following ways:

- Mercedes misrepresented that the Class Vehicles and the warranties had characteristics, benefits, or uses that they did not have (Cal. Civ. Code § 1770(a)(5));

- Mercedes misrepresented that the Class Vehicles and the warranties were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

- Mercedes advertised the Class Vehicles and the warranties with an intent not to sell/lease them as advertised (Cal. Civ. Code § 1770(a)(9));

- Mercedes misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Cal. Civ. Code § 1770(a)(14)); and

- Mercedes misrepresented that the Class Vehicles and the warranties were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

205. Mercedes's unfair and deceptive acts or practices occurred repeatedly in Mercedes's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to purchasers and lessees of the Class Vehicles.

206. Mercedes knew, by 2003, possibly earlier, and certainly by model year 2009, that the Class Vehicles' Electrical Systems suffered from an inherent defect, were defectively designed or manufactured, would cause parasitic battery drains, and were not suitable for their intended use.

207. Mercedes had exclusive knowledge of material facts concerning the existence of the Electrical System Defect in its Class Vehicles. Furthermore, Mercedes actively concealed the Defect from consumers by denying the existence

of the Defect to Class Members who contacted Mercedes and its dealerships about the parasitic battery drains, failing to cover temporary "fixes" under warranty, and failing to offer Class Members a permanent solution to the Electrical System Defect.

208.    Mercedes was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Electrical System Defect, as well as the associated costs that would have to be repeatedly expended in order to temporarily address the parasitic battery drains, because:

- Mercedes was in a superior position to know the true state of facts about the Electrical System Defect in the Class Vehicles;

- Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had the Electrical System Defect until, at the earliest, the manifestation of the Defect; and

- Mercedes knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover the Electrical System Defect prior to its manifestation.

209.    The facts concealed or not disclosed by Mercedes to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the Electrical System

Defect to be an impairment to the driveability and usability of the Class Vehicle, as Plaintiffs and Class Members did.

210.    Had Plaintiffs and other Class Members known that the Class Vehicles had the Electrical System Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for it.

211.    Plaintiffs and Class Members are reasonable consumers who did not expect their Class Vehicles to contain a defective Electrical System. It is a reasonable and objective consumer expectation for consumers to expect the Electrical System not to cause parasitic battery drains that impair the driveability and usability of the Class Vehicles.

212.    As a result of Mercedes's misconduct, Plaintiffs and Class Members have been harmed and have suffered actual damages in that the Class Vehicles contain defective Electrical Systems that cause parasitic battery drains, results in numerous battery replacements, the purchase and use of battery jump backs to recharge car batteries, costly diagnostics, and rental vehicle expenses.

213.    As a direct and proximate result of Mercedes's unfair or deceptive acts or practices, Plaintiffs and Class Members have suffered and will continue to suffer actual damages in that they have a Vehicle with a defective Electrical

System and they have experienced and may continue to experience parasitic battery drains for which there is no permanent fix.

214.    Mercedes received proper notice of its alleged violations of the CLRA pursuant to Cal. Civ. Code § 1782(a), via a letter sent to Mercedes and its registered service agent on February 24, 2022, on behalf of Plaintiffs and all others similarly situated. Mercedes failed to provide the appropriate relief for its violation of the CLRA within 30 days of the date of the notification letter. The notice letter is attached hereto as **Exhibit A**.

215.    Thus, pursuant to Cal. Civ. Code §§ 1780(a), 1780(e), and 1782(a), Plaintiffs seek actual damages, restitution, attorneys' fees and costs, and any other relief the Court deems proper.

## FOURTH CAUSE OF ACTION
### Breach of Express Warranty pursuant Song-Beverly Warranty Act
### (by Plaintiff Linda Blackwell against all Defendants)

216.    Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

217.    Plaintiff brings this cause of action for herself and on behalf of Class Members.

218.    The Class Vehicles are "consumer goods" under Cal. Civ. Code § 1791(a).

219.   Mercedes is and was at all relevant times a "manufacturer" and seller of the Class Vehicles under Cal. Civ. Code § 1791(j); and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles under Cal. Civ. Code § 1791(i).

220.   Plaintiff and Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by Mercedes.

221.   Mercedes expressly warranted the Class Vehicles against defects including the Electrical System Defect, as described above, within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2.

222.   As described above, the Electrical System in the Class Vehicles is defective. The Electrical System Defect substantially impairs the use, driveability, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiff and Class Members.

223.   Mercedes knew of the Electrical System Defect when it expressly warranted the Class Vehicles, wrongfully and fraudulently concealed material facts regarding the Defect, failed to inform Class Members that the Class Vehicles had the Defect, and induced Plaintiff and Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

224.    Plaintiff and Class Members were either in privity with MBUSA as original purchasers or lessees, or otherwise afforded the benefits of the express warranty.

225.    MBUSA breached its express warranties by supplying the Class Vehicles to Plaintiffs and Class Members with the Electrical System Defect.

226.    MBUSA is obligated, under the terms of its express warranties, to make repair and/or replacements to permanently correct the Electrical System Defect for Plaintiff and Class Members.

227.    As more fully detailed above, MBUSA was provided with appropriate notice and has been on notice of the Defect and of its breach of express warranties from various sources.

228.    The Class Vehicles were under this express warranty when they exhibited the Electrical System Defect.

229.    Plaintiffs gave MBUSA a reasonable opportunity to cure its failures with respect to its warranties, and MBUSA failed to do so free of charge or at all.

230.    MBUSA breached its express warranties by failing to permanently repair the Class Vehicles and by failing to provide to Plaintiff or Class Members, as a warranty replacement, a product that conforms to the qualities and

characteristics that it expressly warranted when it sold the Class Vehicles to Plaintiff and Class Members.

231.    Affording MBUSA a reasonable opportunity to cure its breach of express warranties was unnecessary and futile here. When Plaintiff and other Class Members provided such notice and sought relief under the warranty, MBUSA refused to do so. Mercedes dealerships told Class Members battery replacements were not covered by their warranties. When Mercedes dealerships did replace batteries, software, or other electrical components at no charge to Class Members, the battery drains reoccurred again. Furthermore, several Mercedes dealerships told Class Members the Defect was a known problem without a permanent fix.

232.    To the extent any express warranties do not by their terms cover the defects alleged in this Complaint, and to the extent the contractual remedy is in any other respect insufficient to make Plaintiff and Class Members whole, the warranties fail of their essential purpose and, accordingly, recovery by Plaintiff and Class Members is not restricted to the promises in any express warranties, and they seek all remedies that may be allowed.

233.    Any attempt by MBUSA to limit or disclaim the express warranties in a manner that would exclude coverage of the Electrical System Defect is unconscionable as a matter of law because the relevant purchase/lease transactions

were tainted by MBUSA's concealment of material facts. Thus any such effort by MBUSA to disclaim, or otherwise limit, its liability for the Electrical System Defect is null and void. Any caveats, limitations, or "asterisks" to such coverage were never disclosed to Plaintiffs because:

- Plaintiffs and Class Members could not assent to any disclaimers or limitations on its new vehicle warranty because Mercedes's customers (Plaintiffs and Class Members) only received such terms after the delivery of Mercedes's vehicles.

- Mercedes prevents Plaintiffs and Class Members from assenting to any disclaimers or limitations on its new vehicle warranties by including such terms in a cellophane-plastic-sealed warranty booklet that is only presented to Plaintiffs and Class Members until after the vehicle delivery.

- Mercedes post-sale-and-delivery disclaimers and limitations on its vehicle warranties are ineffectual because such terms go to the essence of Plaintiffs and Class Members' vehicle sale or lease contracts.

234.    As a direct and proximate result of MBUSA's breach of express warranties, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including out-of-pocket costs and the costs of needed present and future repairs, in an amount to be determined at trial, and are entitled to the relief requested *infra*.

## FIFTH CAUSE OF ACTION
### Breach of Implied Warranty pursuant Song-Beverly Consumer Warranty Act
### (by Plaintiff Linda Blackwell against all Defendants)

235. Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

236. Plaintiff bring this cause of action for themselves and on behalf of Class Members.

237. Mercedes's Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

238. Mercedes is a "manufacturer" within the meaning of Cal. Civ. 11 Code § 1791(j).

239. Plaintiff and Class Members who purchased or leased their Class Vehicles within the State of California are "buyers" and "lessees" within the meaning of Cal. Civ. Code §§ 1791(b) and (h).

240. Mercedes impliedly warranted to Plaintiff and Class Members that its Vehicles were "merchantable" within the meaning of Cal. Civ. Code 17 §§ 1791.1(a) and 1792.

241. Mercedes impliedly warranted to Plaintiff and Class Members that it would repair or replace any defective products, including the defective Electrical System.

- 73 -

242.   The propensity of the Electrical System Defect to render the vehicle inoperable means that the Class Vehicles are not of the quality that a buyer or lessee would reasonably expect, and therefore not merchantable.

243.   The Class Vehicles do not conform to the promises or affirmations of fact made by Mercedes in its promotional materials and vehicle owner manuals in that the Electrical System Defect in the Class Vehicles' means that they are neither "durable," or possess "longevity," nor are the product of "state-of-the-art engineering."

244.   In violation of Cal. Civ. Code § 1791.1(a), Mercedes breached its implied warranty by selling/leasing Class Vehicles that were defective and refusing to permanently replace and/or repair the defective Electrical Systems.

245.   The Electrical System Defect has deprived Plaintiff and Class Members of the benefit of their bargain, and have caused the Class Vehicles to depreciate in value.

246.   Any attempt by Mercedes to limit or disclaim the express warranties in a manner that would exclude coverage of the Electrical System Defect is unenforceable and void pursuant to Cal. Civ. Code §§ 1790.1, 1792.3, and 1793.

247.   As a result of Mercedes's breach of its implied warranties, Plaintiff and Class Members have been damaged in an amount to be proven at trial and are

entitled to incidental, consequential, and other damages and other legal and

equitable relief, as well as costs and attorneys' fees, pursuant to Cal. Civ. Code

§§ 1794 and 1795.4.

## SIXTH CAUSE OF ACTION
### Violation of Connecticut Unfair Trade Practices Act ("CUTPA")
### (by Susanna Melanson against all Defendants)

248.    Plaintiff incorporates by reference each allegation set forth in the

preceding paragraphs.

249.    Plaintiff brings this cause of action for herself and on behalf of Class

Members.

250.    Plaintiff, Class Members, and Defendants are "persons" as defined by

CUTPA. Conn. Gen. Stat. § 42-110a.

251.    Mercedes engaged in unfair methods of competition and unfair or

deceptive acts and practices in the manufacturing, marketing, advertising, sale,

leasing, and warranting of Class Vehicles that occurred in the conduct of trade or

commerce by systematically breaching its warranty obligations and fraudulently

concealing the Electrical System Defect that caused parasitic battery drains from

Class Members.

252.    Mercedes committed unfair business acts and practices in violation of

Conn. Gen. Stat. § 42-110b, because the acts and practices described herein,

including but not limited to Mercedes's failure to provide a permanent remedy to fix the Electrical System Defect, were immoral, unethical, oppressive, and unscrupulous, as well as substantially injurious to Plaintiff and Class Members. Further, Mercedes's acts and practices were unfair in that they were contrary to common law, state and federal statutes, and public policy.

253.   Mercedes committed unfair and deceptive acts and practices, in violation of Conn. Gen. Stat. § 42-110b, when it concealed the existence and nature of the Electrical System Defect, while representing in its marketing, advertising, and other broadly disseminated representations that its battery, a component of its electrical system, provided "advanced performance," "efficiency," and was "fine-tuned to complement" the "exact network of engine sensors, electrical harnesses, and signal receivers" in the Class Vehicles, which they do not as evidence by the parasitic battery drain, in addition to failing to honor its warranties.

254.   As a direct and proximate result of Mercedes's unfair, unlawful, and deceptive practices, Plaintiff and Class Members have suffered an ascertainable loss of money and loss in value of their Class Vehicles.

255.   Plaintiff and Class Members seek actual damages, costs and reasonable attorneys' fees, and order enjoining Mercedes from committing such

unlawful, unfair, and fraudulent business practices pursuant to Conn. Gen. Stat. § 42-110g.

## SEVENTH CAUSE OF ACTION
### Fraud by Concealment
### (by Plaintiffs Susanna Melanson and Linda Blackwell against all Defendants)

256.   Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

257.   Plaintiffs bring this cause of action for themselves and on behalf of all Class Members.

258.   Mercedes concealed and suppressed material facts concerning the quality of the Electrical Systems in the Class Vehicles.

259.   Mercedes concealed and suppressed material facts concerning the serious Electrical System Defect causing Class Vehicles' batteries to drain overnight. Mercedes knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing the vehicles. Mercedes furthered and relied upon this lack of disclosure to further promote payments for temporary measures to abate (but not eliminate) the Defect, and in some cases accused Plaintiffs and Class Members of causing the problem – all the while concealing the true nature of the Defect from Plaintiffs and Class Members.

Mercedes further denied the very existence the Defect when Plaintiffs and Class Members complained of the Defect.

260.    Mercedes committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers and lessees of Mercedes vehicles, that the Class Vehicles were world class, warranted, and reliable vehicles and concealed the information in order to prevent harm to Mercedes and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decision to purchase or lease the Class Vehicles.

261.    Mercedes had a duty to disclose the Defect in the Class Vehicles because they were known and/or accessible only to Mercedes; Mercedes had superior knowledge and access to the facts; and Mercedes knew the facts were not known to, or reasonably discoverable, by Plaintiffs and Class Members. Mercedes also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete

without the disclosure of the additional facts set forth above regarding their actual quality, safety, reliability, and usability. Even when faced with complaints regarding the Defect, Mercedes misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase/lease and again when the battery failure was complained of to Mercedes. The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiffs and Class Members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

262.    Mercedes actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, avoid recalls that would hurt the brand's image and cost money, and did so at the expense of Plaintiffs and Class Members.

263.    On information and belief, Mercedes has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class Members and conceal material information regarding the Defect that exists in the Class Vehicles.

264.   Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, i.e., they would not have purchased or leased Class Vehicles, or would have paid less for them. Plaintiffs and Class Members' actions were justified. Mercedes was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

265.   Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damages. The price they paid for Class Vehicles did not factor in the existence of the Defects (*i.e.*, there was overpayment at the time of purchase). Further, Plaintiffs and Class Members paid for temporary measures and/or replacement parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all.

266.   Accordingly, Mercedes is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

267.   Mercedes's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and Class Members' rights and well-being to enrich Mercedes.

**EIGHTH CAUSE OF ACTION**
**Violation of the Minnesota Prevention of**
**Consumer Fraud Act (Minn. Stat. § 325F.68 et seq.)**
**(By Plaintiff Muhammed Jackson against all Defendants)**

268.    Plaintiff Muhammed Jackson incorporates by reference all paragraphs as though fully set forth herein.

269.    Plaintiff brings this claim on behalf of himself and Class Members.

270.    The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

271.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69.

272.    In the course of their business, Mercedes concealed and suppressed material facts concerning the Electrical Drain Defect. Defendants falsely represented the quality of the Class Vehicles and omitted material facts regarding the electrical system, as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiff and Class Members to purchase the Class Vehicles, and to increase Mercedes's revenue and profits.

273.   Mercedes's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity and were likely to mislead and create a false impression in consumers, and did in fact deceive reasonable consumers, including Plaintiff and Class Members.

274.   The facts concealed and omitted by Mercedes were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price. Had Plaintiff and Class Members known of the Electrical Drain Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

275.   Plaintiff and Class Members had no way of discerning that the Mercedes's representations were false and misleading and/or otherwise learning the facts that the Mercedes had concealed or failed to disclose. Plaintiff and Class Members did not, and could not, unravel Mercedes's deception on their own.

276.   Mercedes owed Plaintiff and Class Members a duty to disclose the truth about the Defect because Plaintiffs and the other Class Members reposed trust in Mercedes which possessed exclusive knowledge about the electrical systems in

the Class Vehicles, including the Defect; and intentionally concealed the foregoing from Plaintiff and Class Members.

277.   Mercedes had a duty to disclose that the Class Vehicles were defective, because, having volunteered to provide information to Plaintiff and Class Members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.

278.   Mercedes also had a duty to disclose that the Class Vehicles were defective because the Defect creates a safety issue.

279.   Mercedes's violations present a continuing risk to Plaintiff as well as to the general public. Mercedes's unlawful acts and practices complained of herein affect the public interest.

280.   Plaintiff and Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damages as a proximate result of Mercedes's conduct in that Plaintiff and Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Mercedes's misrepresentations and omissions.

281.   Plaintiff and Class Members suffered injuries in fact and actual damages as a direct and proximate result of Mercedes's violations of the Minnesota CFA.

282.   Pursuant to Minn. Stat. § 8.31(3a), Plaintiff and Class Members seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

283.   Plaintiff also seeks punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Mercedes's acts show deliberate disregard for the rights of others.

**NINTH CAUSE OF ACTION**
**Violation of the Minnesota Uniform Deceptive Trade Practices Act**
**(Minn. Stat. § 325D.43-48 et seq.)**
**(By Plaintiff Muhammed Jackson against all Defendants)**

284.   Plaintiff Muhammed Jackson incorporates by reference all paragraphs as though fully set forth herein.

285.   Plaintiff brings this claim on behalf of himself and Class Members.

286.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;"

represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" or "advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44.

287.    In the course of its business, Mercedes engaged in deceptive practices by representing that the Class Vehicles have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have; representing that Class Vehicles are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Class Vehicles with intent not to sell them as advertised. Mercedes participated in misleading, false, or deceptive acts that violated the Minnesota DTPA.

288.    These actions occurred in the conduct of trade or commerce.

289.    Mercedes's unfair or deceptive acts or practices, including their misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and Class Members, about the safety and reliability, quality, and value of the Class Vehicles.

290.   The facts concealed and omitted by Mercedes were material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price. Had Plaintiff and Class Members known of the Electrical Drain Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

291.   Plaintiff and Class Members had no way of discerning that the Mercedes's representations were false and misleading and/or otherwise learning the facts that the Mercedes had concealed or failed to disclose. Plaintiff and Class Members did not, and could not, unravel the Mercedes's deception on their own.

292.   Mercedes owed Plaintiff and Class Members a duty to disclose the truth about the Defect because Plaintiffs and the other Class Members reposed trust in Mercedes which possessed exclusive knowledge about the electrical systems in the Class Vehicles, including the Defect; and intentionally concealed the foregoing from Plaintiffs and Class Members.

293.   Mercedes had a duty to disclose that the Class Vehicles were defective, because, having volunteered to provide information to Plaintiff and Class Members, Mercedes had the duty to disclose not just the partial truth, but the entire truth.

294.   Mercedes also had a duty to disclose that the Class Vehicles were defective because the Defect creates a safety issue.

295.   Plaintiff and Class Members have suffered ascertainable loss and actual damages as a direct and proximate result of Mercedes's misrepresentations, concealment, and failure to disclose material information.

296.   Pursuant to Minn. Stat. §§ 8.31(3a) and 325D.45, Plaintiff and Class Members seek actual damages, attorneys' fees, and any other relief that this Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Violation of the Texas Deceptive Trade Practices Consumer Protection Act**
**(Tex. Bus. and Comm. Code §§ 17.41 *et seq*.)**
**(By Plaintiff Keith Colwell against all Defendants)**

297.   Plaintiff Keith Colwell incorporates by reference all paragraphs as though fully set forth herein.

298.   Plaintiff brings this claim on behalf of himself and Class Members.

299.   Plaintiff and Class Members are "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4); Tex. Bus. & Com. Code § 17.41.

300.   Defendants are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

301.   Mercedes engaged in "trade" or "commerce" or "consumer transactions" within the meaning of Tex. Bus. & Com. Code § 17.46(a).

302.    The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

303.    In the course of their business, Mercedes concealed and suppressed material facts concerning the Class Vehicles, as described above.

304.    Specifically, Mercedes misrepresented the Class Vehicles as safe and reliable and failed to disclose and actively concealed the Electrical Drain Defect.

305.    Mercedes thus violated the Texas DTPA by, at minimum, (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Class Vehicles with the intent not to sell or lease them as advertised. Tex. Bus. & Com. Code Ann. §§ 17.46(5), (7), and (9).

306.    Mercedes intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and Class Members.

307.  Mercedes knew or should have known that their conduct violated the Texas DTPA.

308.  Plaintiff and Class Members had no way of discerning that Mercedes's representations were false and misleading and/or otherwise learning the facts that the Mercedes had concealed or failed to disclose. Plaintiff and Class Members did not, and could not, unravel Mercedes's deception on their own.

309.  Mercedes owed Plaintiff and Class Members a duty to disclose the truth about the Defect because Plaintiffs and the other Class Members reposed trust in Mercedes which possessed exclusive knowledge about the electrical systems in the Class Vehicles, including the Defect; failed to disclose all material facts regarding the Defect, intentionally concealed the Defect from Plaintiff and Class Members, and/or made misrepresentations that were misleading because they were contradicted by the withheld facts.

310.  Mercedes's concealment of the Defect was material to Plaintiff's and Class Members' decision to purchase or lease the Class Vehicles.

311.  Mercedes's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and Class Members, about the quality and safety of the Class Vehicles.

312.   Mercedes's violations present a continuing risk to Plaintiff and Class Members, as well as the general public. Mercedes's unlawful acts and practices complained of here affect the public interest.

313.   Plaintiff and Class Members suffered ascertainable loss and actual damages as a direct and proximate result of Mercedes's misrepresentations, concealment, and failure to disclose material information.

314.   Pursuant to Tex. Bus. & Com. Code Ann. § 17.505, Mercedes had notice of these issues through numerous public NHTSA complaints and individual lawsuits, as well as letters sent by Plaintiff providing notice of the issues raised in this Complaint sent on September 9, 2022. These letters (sent separately to each Defendant) are attached hereto as **Exhibit B**.

315.   Pursuant to Tex. Bus. & Com. Code § 17.50, Plaintiff and Class Members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

## XIII.  RELIEF REQUESTED

316.   Plaintiffs, on behalf of themselves, and all others similarly situated, request the Court to enter judgment against Mercedes, as follows:

- an order certifying the proposed Class and/or any appropriate subclasses, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

- a declaration that the Electrical Systems in Class Vehicles have a Defect that results in battery drains and failures, and that this Defect requires disclosure;

- a declaration that Mercedes must, at its own expense, notify owners and lessees of Class Vehicles of the Defect;

- a declaration that any limitation on the Class Vehicles' warranty that would avoid responsibility for the Defect is void;

- an order enjoining Mercedes to reassess all prior warranty claims related to battery drain;

- an ordering enjoining Mercedes, upon a Class Member's request, to pay the cost of inspection to determine whether the Defect is manifest, with any coverage disputes adjudicated by a special master.

- an order enjoining Mercedes from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and to permanently repair the Class Vehicles so that they no longer possess the Electrical System Defect;

- an award to Plaintiffs and Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

- an order requiring Mercedes to disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten revenue it received from the sale or lease of the Class Vehicles, or make full restitution thereof to Plaintiffs and Class Members;

- an award of attorneys' fees and costs, as allowed by law;

- an award of pre-judgment and post-judgment interest, as provided by law;

- leave to amend this Complaint to conform to the evidence produced at trial; and

- such other relief as may be appropriate under the circumstances.

## XIV.  DEMAND FOR JURY TRIAL

317.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a

trial by jury of any and all issues in this action so triable of right.

Dated: June 27, 2025

Respectfully submitted,

By:_____
        Ketan A. Patel

Ketan A. Patel (State Bar Number 121099)
kp@corpus-law.com
CORPUS LAW PATEL, LLC
PO BOX 724713
Atlanta, Georgia 31139
Telephone:  (678) 597-8020

Annika K. Martin (*pro hac vice*)
akmartin@lchb.com
Rachel J. Geman (*pro hac vice*)
rgeman@lchb.com
Jacob S. Miller (*pro hac vice*)
jmiller@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

Michael Levin-Gesundheit (*pro hac vice*)
mlevin@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, Suite 2900
San Francisco, CA 94111
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

Mark P. Chalos (*pro hac vice*)
mchalos@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
Telephone:   (615) 313-9000
Facsimile:   (615) 313-9965

Christopher A. Seeger
Christopher Ayers
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-1000
cseeger@seegerweiss.com
cayers@seegerweiss.com

Scott A. George
SEEGER WEISS LLP
325 Chestnut Street
Philadelphia, PA 19106
(215) 564-2300
sgeorge@seegerweiss.com

James E. Cecchi
Carella, Byrne, Cecchi, Olstein,
Brody & Agnello, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
973-994-1700
jcecchi@carellabyrne.com

Zachary S. Bower
Carella, Byrne, Cecchi, Olstein,
Brody & Agnello, P.C.
2222 Ponce DeLeon Blvd.
Miami, FL 33134
973-994-1700
zbower@carellabyrne.com

Zachary A. Jacobs
Carella, Byrne, Cecchi, Olstein,
Brody & Agnello, P.C.
222 S Riverside Plaza
Chicago, IL 60606
973-994-1700
zjacobs@carellabyrne.com

*Attorneys for Plaintiffs and the Proposed Class*